(C. D. 362)

DOLLAR STEAMSHIP LINES, INC., LTD. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 27, 1940)

*Philip Stein* for the plaintiff.
*Webster J. Oliver*, Assistant Attorney General. (*John J. McDermott* and *James F. Donnelly*, special attorneys), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges.

KEEFE, Judge: In this suit the plaintiff seeks to recover certain customs duties alleged to have been illegally assessed at Honolulu upon 144 blankets purchased by the plaintiff at Hong Kong for use upon the steamer *President Coolidge*. Duty was assessed thereon at 50 per centum ad valorem under the provisions of section 466 of the

Tariff Act of 1930 as ships' equipment. The plaintiff claims that duties should be remitted or refunded under said section because the necessity of purchasing the blankets arose by reason of stress of weather or other casualty and the master of the vessel was compelled to make the purchase in order to secure the safety and seaworthiness of the vessel. It is alternatively claimed that the blankets are not regarded as ships' equipment but are, in fact, ships' stores or sea stores within the meaning of section 446 of said act and consequently exempt from duty.

It appears from the evidence that the blankets were acquired because of an extreme drop in the temperature upon the voyage of the *President Coolidge* from Manila to Hong Kong. Through contract with the Hawaiian Sugar Planters Association the plaintiff agreed to transport Filipino workmen to Honolulu for seasonable work upon sugar plantations. A number of such workmen were steerage passengers upon said vessel during the winter months of 1934, having embarked in good physical condition carrying with them the necessities for the voyage supplied by the association including cotton blankets. Being inhabitants of a tropical country the passengers were very susceptible to changes in temperature. During the trip over a period of 36 hours the temperature fell from 80 degrees to approximately 40 degrees. In consequence thereof head colds developed among about one-half of the Filipinos. The ship's infirmary became filled with men having temperatures up to 104 degrees. The cotton blankets supplied by the association were inadequate for the protection of the Filipinos and, in order to keep warm, said passengers congregated several in a bed, sharing their blankets in common. This congestion in the sleeping arrangements aggravated the spread of the head colds very rapidly. The ship's doctor was unable to cope with the situation and feared an epidemic of influenza and of meningitis, as Filipinos were very susceptible to such disorders. Having had previous experience where such head colds had developed into influenza and meningitis resulting in the officers and crew of the ship becoming incapable of performing their regular duties, the doctor upon reaching Hong Kong recommended to the captain the purchase of woolen blankets so that the individual cases might be isolated and the infection checked. After the purchase of said blankets the epidemic was averted and the colds subsided without having spread to the officers and crew of the ship.

The captain testified that he purchased the blankets upon recommendation of the ship's doctor; that blankets are never furnished to steerage passengers by the steamship company; and that said blankets were still on board the vessel as far as he knew, although some might have been stolen, and that they were retained for use of the crew. When asked if the blankets contributed in any way to the safety of

the vessel during the voyage, the captain stated that it was a hard question to answer because, if an epidemic broke out, it might have spread throughout the vessel and no one could foresee what might have happened. He was of opinion that there was a possibility of an epidemic but in fact none occurred. He was unable to state whether or not the blankets in question contributed to the seaworthiness of the vessel during the voyage. He admitted, however, that in his opinion the seaworthiness of the *Coolidge* was not altered or changed in any manner after the blankets were taken on board at Hong Kong.

The ship's doctor testified that the infection was spreading rapidly among the Filipinos and anyone familiar with the conditions would know that something had to be done to prevent the condition spreading to the crew and incapacitating them from the performance of their duties. In his opinion the crew benefited from the purchase of the blankets.

It was agreed between counsel that if certain additional witnesses were called to the stand they would testify that subsequent to the purchase of the blankets they were retained on board the vessel for the use of the passengers and the crew and were never landed, excepting such blankets as perhaps had been stolen and landed without the knowledge of the officers or owners of the vessel; and that there are about 76 blankets still remaining on the vessel, the remainder of the original consignment being apparently stolen or destroyed and never landed by the officers or owners of the vessel.

A marine inspector whose duties included inspection of vessels of the United States Merchant Marine for safety and ships' equipments involving the seaworthiness of vessels, testified that during his experience he had never examined blankets on a ship to ascertain whether or not a vessel was seaworthy. He was of the opinion that blankets bear no relation to the safety or seaworthiness of vessels. To be seaworthy a vessel must be waterproof as far as possible so as to withstand the elements of the weather; also free from fire hazards, and have machinery in operating condition. In his opinion the seaworthiness of a vessel is not affected by the health of the crew or passengers. He admitted, however, that the seaworthiness of a vessel would be affected if it was insufficiently manned.

An inspector of customs testified for the Government that he searched the *President Coolidge* in San Francisco on September 26, 1934, for any undeclared articles; that he found some of the blankets in question in use in the crew's quarters, particularly in the waiter's quarters; that some were also found in the lockers of the first-class cabin section. When he made the count there were 133 blankets. They consisted of steamer rugs of dark plaid with various colors, the colors being different in each blanket, and each had a six-inch fringe

attached thereto. At the time of discovery of blankets the *President Coolidge* had made two trips subsequent to placing the same on board.

A deck steward who was on board the *President Coolidge* at the time the blankets were delivered to the ship, testified that he had seen the blankets after they were taken on board; that he was short of blankets and took one of the same for his own use from the deck chest. He admitted that such procedure was not customary and he had no authority to take it. He further testified that the crew does not customarily use deck blankets designated for the use of passengers.

Counsel for the plaintiff presents the following contentions:

1. That the unexpected and unusual sudden drop in the weather temperature and the resulting development of the highly contagious influenza epidemic among the steerage passengers aboard the vessel on the high seas constituted "stress of weather or other casualty" within the meaning of those terms as used in Section 466 of the Tariff Act of 1930, *supra.*

2. That the "stress of weather" or "casualty" aboard the vessel upon the high seas compelled the purchase of the blankets in order to prevent spread of the contagious disease to the other passengers, members of the crew, and officers' staff.

3. That, had the blankets not been purchased, the contagious epidemic would, with reasonable certainty, have spread to the crew and officers of the vessel, thus undermanning it and rendering it unsafe and "unseaworthy." Therefore, their purchase was necessary "to secure the safety and seaworthiness of the vessel to enable her to reach her port of destination."

4. That, assuming the blankets to be properly classified as "ships' equipment" under Section 466 (Sec. 3114, R. S.) of the Tariff Act of 1930, *supra*, as classified by the collector they are nevertheless exempt from duty by reason of the fact that they come within the qualifying provisions of Section 466 (Sec. 3115 (1) R. S.) *supra*, as claimed in the protest.

5. That the blankets are "ships' stores" or "sea stores" and as such are in any event, by virtue of the claim in our protest and the provisions of Section 446 of the Tariff Act of 1930, *supra*, exempt from duty.

The Government contends that the blankets are ships' equipment and dutiable as such, and are not exempt from duty because of stress of weather or other casualty, because the statute contemplates exemptions from duty only upon such purchases that are made as the result of a casualty and does not include equipment purchased in anticipation thereof; and that as there was no occurrence of an epidemic which affected the officers and crew of the *President Coolidge* so that the vessel became undermanned, the casualty was only speculative at the time the blankets were purchased and might never have happened, and in fact never did develop. The Government further contends that the blankets do not come within the meaning of "ships' stores" or "sea stores" as provided for in section 446, because under the law, as interpreted by the courts, the only sea stores which may be retained on board a vessel without the payment of duty are

such that were on board at the time the vessel last left a United States port.

Section 466 of the Tariff Act of 1930, provides as follows:

SEC. 466. EQUIPMENT AND REPAIRS OF VESSELS.

Sections 3114 and 3115 of the Revised Statutes, as amended by the Tariff Act of 1922, are amended to read as follows:

SEC. 3114. The equipments, or any part thereof, including boats, purchased for, or the repair parts or materials to be used, or the expenses of repairs made in a foreign country upon a vessel documented under the laws of the United States to engage in the foreign or coasting trade, or a vessel intended to be employed in such trade, shall, on the first arrival of such vessel in any port of the United States, be liable to entry and the payment of an ad valorem duty of 50 per centum on the cost thereof in such foreign country; and if the owner or master of such vessel shall willfully and knowingly neglect or fail to report, make entry, and pay duties as herein required, such vessel, with her tackle, apparel, and furniture, shall be seized and forfeited. For the purposes of this section, compensation paid to members of the regular crew of such vessel in connection with the installation of any such equipments or any part thereof, or the making of repairs, in a foreign country, shall not be included in the cost of such equipment or part thereof, or of such repairs.

SEC. 3115. If the owner or master of such vessel furnishes good and sufficient evidence—

(1) That such vessel, while in the regular course of her voyage, was compelled, by stress of weather or other casualty, to put into such foreign port and purchase such equipments, or make such repairs, to secure the safety and seaworthiness of the vessel to enable her to reach her port of destination; or

(2) That such equipments or parts thereof or repair parts or materials, were manufactured or produced in the United States, and the labor necessary to install such equipments or to make such repairs was performed by residents of the United States, or by members of the regular crew of such vessel,

then the Secretary of the Treasury is authorized to remit or refund such duties and such vessel shall not be liable to forfeiture, and no license or enrollment and license, or renewal of either, shall hereafter be issued to any such vessel until the collector to whom application is made for the same shall be satisfied, from the oath of the owner or master, that all such equipments and repairs made within the year immediately preceding such application have been duly accounted for under the provisions of this and the preceding sections, and the duties accruing thereon duly paid; and if such owner or master shall refuse to take such oath, or take it falsely, the vessel shall be seized and forfeited.

Section 446 of said act provides as follows:

SEC. 446. SUPPLIES AND STORES RETAINED ON BOARD.

Vessels arriving in the United States from foreign ports may retain on board, without the payment of duty, all coal and other fuel supplies, ships' stores, sea stores, and the legitimate equipment of such vessels. Any such supplies, ships' stores, sea stores, or equipment landed and delivered from such vessel shall be considered and treated as imported merchandise: *Provided*, That bunker coal, bunker oil, ships' stores, sea stores, or the legitimate equipment of vessels belonging to regular lines plying between foreign ports and the United States, which are delayed in port for any cause, may be transferred under a permit by the collector and under customs supervision from the vessel so delayed to another vessel of the same line and owner, and engaged in the foreign trade, without the payment of duty thereon.

It will be noted that section 466 provides for the remission of duties if a vessel *"was compelled, by stress of weather or other casualty,* to put into such foreign port and purchase such equipments, or make such

repairs, *to secure the safety and seaworthiness of the vessel to enable her to reach her port of destination;.*" [Italics not quoted.]

The question to be considered first is whether or not the purchase of the blankets was the result of "stress of weather or other casualty." Second, if it is determined that the purchase of blankets arose from such a cause, the question arises as to whether or not the purchases were compelled to be made in order to secure the safety and seaworthiness of the vessel so as to enable her to reach the port of Honolulu.

According to the evidence the necessity which compelled the purchase of the blankets arose from a drastic change in the temperature. May a sudden drop in the temperature be classed as "stress of weather or other casualty?" The dictionary definitions of "casualty" have a broad meaning, varying according to the sense in which the word is used, and the courts have restricted the meaning thereof to the particular class of casualty contemplated by the particular statute. Funk and Wagnalls New Standard Dictionary, page 416, defines "casualty" as follows:

1. A fatal or serious accident or disaster; accidental death or disablement; as, a *casualty* at a fire. 2. pl. In time of war, losses arising from any cause, as from death, disablement, capture, or desertion. 3. That which occurs by chance; chance. * * * 4. *Law.* Inevitable accident; an event not to be foreseen or guarded against.

In the case of *Crystal Spring Distillery Co.* v. *Cox*, 47 Fed. 693, the words "or other casualty" appearing in the phrase "destroyed by accidental fire or other casualty" were defined as meaning an accident, or an event not to be foreseen or guarded against. Losses resulting from either excessive or unusual summer heat were held not to constitute an actual destruction by accidental fire or other casualty. Upon appeal, the Circuit Court of Appeals, 49 Fed. 555, sustained the lower court in words, following:

We are clearly of the opinion that the court below was correct in its holding that "other casualty," as used in said section, meant an accidental destruction by some cause of like character and operation as fire such as lightning, floods, cyclones, storms, or other uncontrollable force, which ordinary foresight and prudence could not guard against or prevent.

In the case of *Maryland Steel Products Co.* v. *United States*, Abstract 51738, the court stated that the "other casualty" must be regarded as cognate or similar in its causation to the "accidental fire" by which it is caused.

In the case at bar the word "casualty" is to be considered together with the phrase "stress of weather." The phrase "or other casualty" is supplemental to and qualifies the phrase "stress of weather" broadening the term to include other similar casualties. In order to determine the particular class of casualty under which exemption from duty may be granted by the Secretary of the Treasury, we must con-

sider the meaning of the term "stress of weather." The word "stress" is defined in Funk and Wagnalls New Standard Dictionary, page 2396, as follows:

2. Force exerted to or beyond the point of strain; tension; as, to subject a faculty to the utmost stress. 3. Influence exerted forcibly; pressure; violence; compulsion; as *stress* of weather.

We have, therefore, under the term "stress of weather" the forcible influence or violence of the weather exerted upon vessels unexpectedly in such a manner that the safety and seaworthiness thereof is so endangered that the purchase of equipment or the making of repairs becomes necessary in order to enable such vessel to reach her port of destination. A casualty similar to "stress of weather" would include such as is violently exerted; that which comes with unexpected force or violence, such as that of a fire, or a collision, or an explosion.

We are of the opinion that a casualty similar to "stress of weather" should be of necessity a happening that comes with the violence of the turbulent forces of nature. A sudden drop in the temperature would not, therefore, amount to such force exerted to or beyond the point of strain, within the meaning of "casualty" as used in the statute. Even though a sudden drop in temperature was such a casualty, it is apparent that nothing here actually happened by reason thereof which compelled the vessel in question to put into the port of Hong Kong and take the blankets on board. It might be true that the purchase of blankets averted a casualty such as a sudden epidemic endangering the lives of the officers and crew. However, the statute provides for exemption from duty only in the event of a casualty, and a calamitous event which had been averted through the forethought of the ship's officers is not a casualty.

It is alternatively contended that the blankets in question are not equipment of vessels but are such articles as come within the classification of sea stores or ships' stores, and logically fall within the definition of consumable supplies, and that such supplies are ordinarily classed as sea stores.

In the case of *American Line et al.* v. *United States,* T. D. 43625, the court construed sections 446 and 466 of the Tariff Act of 1922, which were similar to the same numbered sections in the present act. It was held that section 446 has reference to the retention on board without payment of duty of ships' stores of sea stores which have not been replenished while in a foreign port. See also *American Mail Line, Ltd.* v. *United States,* Abstract 41735 and *H. E. Warner, Trustee, American Mail Line, Ltd.* v. *United States,* Suit 4284, C. A. D. 136.

Upon consideration of the record and the principle announced in the foregoing decisions, we hold that the blankets in question are not

entitled to exemption from duty because the purchase thereof was not necessitated by stress of weather or other casualty and that such blankets are not within the class of merchandise contemplated under section 446 of the act of 1930. Judgment will therefore be entered in favor of the Government.